**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| SHAWNA MELTON, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | NO. CIV-07-1014-HE |
| ) | |
| FARMERS INSURANCE GROUP, ET AL., ) | |
| ) | |
| Defendants. ) | |

## ORDER

Plaintiff Shawna Melton sued Farmers Insurance Group, Farmers Insurance Exchange, and Farmers Insurance Company, Inc. ("Farmers" or defendant),[1] claiming her former employer wrongfully discriminated and retaliated against her in violation of the Americans with Disabilities Act ("ADA"); the Family and Medical Leave Act ("FMLA"); and Oklahoma public policy.[2] She also asserts a breach of contract claim.[3] Farmers has moved for summary judgment, contending the plaintiff was neither discriminated nor retaliated against and was terminated for excessive absenteeism.

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Viewing the evidence and any reasonable inferences that might be

---

[1]*The parties do not specify which Farmers entity employed the plaintiff.*

[2]*The Oklahoma Supreme Court created an exception to its general rule of at-will employment in* Burk v. K-Mart Corp., *770 P.2d 24 (1989), recognizing a cause of action for wrongful discharge in violation of public policy. The claim is now referred to as a "*Burk *tort."* Wilburn Mid-South Health Dev., Inc.,*343 F.3d 1274, 1277 n.2 (10th Cir. 2003).*

[3]*The plaintiff confessed her breach of contract claim by failing to respond to that aspect of the defendant's motion. See LCvR7.1(g); 56.1(c).*

drawn from it in the light most favorable to the plaintiff, the nonmoving party, Swackhammer v. Sprint/United Mgmt Co., 493 F.3d 1160, 1167 (10th Cir 2007), the court concludes the motion should be granted.[4]

## Background

The plaintiff was hired by Farmers as an office claims representative on April 29, 2004, and began working for the defendant in May. Because Farmers' employees at the facility where the plaintiff worked accept calls from customers who often have urgent insurance needs, employee attendance is important. The plaintiff was informed during an in-person interview conducted before she was hired, that good attendance and punctuality were requirements for the position for which she was applying.

After she was hired, the plaintiff acknowledged in writing that Farmers provided her with access to documents, including the employee handbook, You and Your Company, which summarized Farmers' policies and procedures and that she had read, understood and would "comply with the contents of the ... handbooks, policies and procedures." Defendant's Exhibit 8. The handbook defined "excessive absenteeism"as "ten or more chargeable absences in a rolling 12-month period."[5] Defendant's Exhibit 9, p.5. Under Farmer's

---

[4]*The court struck the plaintiff's initial response brief for noncompliance with LCvR56.1(c). The resubmitted brief did not correct the error. A party responding to a motion for summary judgment should identify each of the opposing party's statements of fact that he or she contests and then specify and submit controverting evidence. Simply identifying the facts that are disputed as the plaintiff did, see plaintiff's response, p. 9, is insufficient.*

[5]*An employee's absences were "monitored on a rolling 12-month basis, measuring back through the previous 12-months from the most current absence." Defendant's Exhibit 9, p. 5.*

attendance policy, absences that were either protected by law or approved by Farmers were not included when determining excessive absenteeism. "Non-chargeable absences include[d], but [were] not limited to approved family/medical/parental leaves ... and absences due to a reasonable accommodation under the Americans with Disabilities Act (ADA)." *Id.* Only chargeable absences were counted against the employee.[6] The discipline imposed after an employee had excessive absenteeism was handled on a case-by-case basis.

After eight unexcused absences between August 2, 2004, and January 10, 2005, the plaintiff was given a "Counseling Memo – Absenteeism," defendant's Exhibit 10, the second step in Farmer's progressive disciplinary policy. Defendant's exhibit 9, p. 5. On February 21, 2005, she received a "Formal Warning – Absenteeism." The plaintiff had missed two days of work in February, with her absence on February 21, 2005, being her "10th chargeable day of absence in the past twelve months." Defendant's Exhibit 11. The warning stated:

> This is a serious situation needing immediate attention. You are hereby being placed on Formal Warning for Absenteeism until 8/2/05. Any chargeable days of absence during this time period will jeopardize your employment status with Farmers Insurance and may led to further disciplinary action, up to and including termination.

*Id.*

After the plaintiff had another unexcused absence on April 8, 2005, she was placed on probation until October, 2005. Defendant's Exhibit 12.

Beginning in mid-February, 2006, the plaintiff went on FMLA leave due to

---

[6]*The court will refer to a "chargeable" absence as an unexcused absence.*

complications with her pregnancy. By May she had exhausted her FMLA leave. She then requested, and was granted, additional time off, returning to work on July 5, 2006. Defendant's Exhibits 1, 20.

In November, 2006, the plaintiff's mother was diagnosed with cancer and her parents moved in with her. The plaintiff's father was unable to assist with his wife's care. The plaintiff drove her mother to chemotherapy sessions and doctor's appointments, dispensed her medications and otherwise helped care for her. She informed staff manager Ron Claiborne and her immediate supervisor, Briton Blair, of her mother's condition, that her parents were living with her, and that she needed to care for her mother as her father could not.

The plaintiff asked Claiborne, in November, 2006, to allow her to work from home to care for her mother and young child.[7] As the plaintiff explained in an email to Trina Calhoun, a human resources representative, dated November 8, 2006, her son had been sick and she "talked to Ron C. about possibly working from home since his pediatrician ha[d] told [her] he will not get well and stay well unless [she could] keep him out of daycare."[8] Defendant's Exhibit 22.

Claiborne denied the plaintiff's request, explaining that Farmers did not have a program that would permit her to work from home. While Farmers did allow some

---

[7] *Farmers did not have a written policy regarding working from home.*

[8] *In her email to Calhoun, the plaintiff stated that Claiborne had advised her that HR probably would not approve her request to work at home since she was not disabled. Defendant's Exhibit 22.*

4

employees to work from home, they were disabled. Claiborne told the plaintiff that since she, personally, was not disabled, Farmer's "reasonable accommodation" policy did not apply. He did tell her that he would "see if he could come up with a pilot type of program to let [her] work from home." Defendant's Exhibit 3, p. 53.[9] The next month the plaintiff asked again and Claiborne again denied her request. The plaintiff also spoke with Blair about working from home and contacted Human Resources ("HR"). All her requests to work from home were denied.

Neither absenteeism nor poor production were mentioned during the plaintiff's performance appraisals in November, 2006, and January, 2007. The plaintiff was given raises both times.

The plaintiff received a second counseling memo on February 5, 2007, after her eighth chargeable day of absence that year.[10] Defendant's Exhibit 13. Although she had been absent other days, they were not counted against her as they constituted FMLA leave.[11] While the plaintiff asserts that, beginning in November, 2006, she periodically missed work to care for her mother, using accrued personal time, vacation and FMLA leave, she does not

---

[9]*Claiborne testified that Farmers had considered a pilot work-at-home program because of space limitations before the plaintiff asked to work at home. He testified that the program was not conceived of specifically for her, but that, if put into place, "[t]here was a possibility that she would be considered for it." Defendant's Exhibit 16, p. 30; pp. 29-31.*

[10]*The plaintiff had been absent, due to being sick, on October 3, 19, 20, 23, and 24 and January 18, 19, and 23.*

[11]*The Absentee/Lateness Report classified this leave as "Pending FMLA." Defendant's Exhibit 13.*

counter the defendant's evidence that she had additional, chargeable days of absence.

Beginning March 13, 2007, Claiborne allowed Trey Brown to work from his home to care for his disabled wife. Claiborne considered five criteria when determining whether to grant Brown's request to work from home: file quality, productivity, production, attendance and overall behavior. He looked at Brown's performance "year-to-date," which was from October 2006, the beginning of Farmer's fiscal year through March. Plaintiff's Exhibit 2, pp. 52-57. He considered that sufficient, as he "had a full quarter to make an assessment on Trey." *Id.* p. 57.[12] He testified that Brown met his monthly production goals in November and December, 2006, but not October, 2006, but had met his year-to-date production goal at the beginning of October of 2006 for the entire year.[13] *Id.* p. 68.

The plaintiff asserts that Claiborne did not have any production results for Brown for the months of January through March, 2007, citing defendant's Exhibit 7 and page 58 of Claiborne's deposition testimony. However, the exhibit included some data for Brown for

---

[12]*The plaintiff asserts that Claiborne testified that "he would allow an employee to miss production goals while working from home and would revoke the work from home arrangement when missing production goals became a 'habitual problem.'" Plaintiff's response, p. 6. The plaintiff mischaracterizes Claiborne's testimony. See plaintiff's exhibit 2, pp. 71-73. She also asserts that Claiborne could not answer why "[i]n approving work from home arrangements," he "did not use the same three-month period for Plaintiff in her request to work from home." Plaintiff's response, p. 6. The question, however, was why Farmers told the plaintiff it would <u>reconsider</u> her request to work from home in six months, rather than three. Plaintiff's exhibit 2, p. 74.*

[13]*Claiborne testified he considered an employee's year-to-date, rather than his or her monthly production. Consequently, an employee might not meet his or her production level one month, but, because he or she had exceeded the level another month, would meet his or her year-to-date quota. See plaintiff's Exhibit 2, p. 70.*

those months, including hourly monthly and year-to-date production figures. It did not include, and Claiborne testified that he could not explain why, there were no "statistics on productivity percentages."[14]

In April, 2007, the plaintiff sent the Human Resources and COD-Departments a written request to work from home, noting that she had discussed the conditions of her two dependents who needed care with her manager Ron Claiborne several times and had, as early as November, 2006, asked to work from home. She stated that she also had spoken to Calhoun about her situation and that both Claiborne and Calhoun had told her she would not be permitted to work from home unless she, personally, was disabled. She said her manager had informed her that she would not be allowed to work from home unless she could meet production goals, but she was "aware of other people in [her] department that ha[d] very similar situations as [her]self who ha[d] been allowed to work from [home] while not meeting their production goals." Defendant's Exhibit 26. The plaintiff included notes from her mother and child's treating physicians with her letter that confirmed their medical conditions.

The plaintiff went to the Equal Employment Opportunity Commission ("EEOC) on April 12, 2007, and filled out an intake questionnaire, alleging disability discrimination. She

---

[14]*A spreadsheet prepared by John Anderson, another Farmer's manager, indicated Brown did not meet his production goals for every week between 2/23 and 4/08/07. Plaintiff's Exhibit 8. Claiborne testified that Anderson's analysis was inaccurate because it was based on an incorrect formula, one that did not take into account days when Brown was absent. Plaintiff's Exhibit 2, pp. 63-64. Brown missed work the first quarter of 2007, as the result of a car accident. See plaintiff's Exhibit 2, pp. 49-50.*

indicated on the form that, although she was not allowed to work from home because she was not disabled, a coworker was permitted to work from his home to care for his wife.

The plaintiff met with two HR employees, Cindy Warminsky and Cassie Tevebaugh, on May 1, 2007, to discuss her written request. During that meeting the plaintiff told the HR personnel that, while she was told she could not work from home because she did not meet performance goals, other employees, who also were not meeting their goals, were.

Following the meeting, on May 4, 2007, Warminsky asked Claiborne and Blair to gather the performance figures for the four employees who had been allowed to work from home and then compare them with the plaintiff's. Claiborne provided the requested information for the four employees, stating that only one of the four, [Trey], did not "have a personal medical condition that would require an accommodation. All other estimators working out of their homes are doing so without a performance tie due to medical accommodations. Should Trey's results drop off, we will exercise our right to bring him back into the office." Defendant's Exhibit 28.[15]

The production goal Claiborne used when assessing the plaintiff's performance was higher than the goal assigned to her by another supervisor, John Anderson. However, the production figures Claiborne provided, which the plaintiff did not challenge, showed that her hourly production of 2.36 did not meet even the 2.4/hour goal the plaintiff asserts Anderson set for her. *Id.*; Plaintiff's Exhibit 10.

---

[15]*When considering work at home requests of a disabled employee, Farmers did not take into account whether the person was meeting production goals. Plaintiff's Exhibit 2, pp. 95-96.*

Warminsky and another HR employee, Cassie Tevebaugh, met with Claiborne on May 11, 2007, to finalize Farmer's response to the plaintiff's written request to work from home. Tevebaugh's notes stated they "[d]etermined it would not be good from a business need to have Shawna work from home" but would be willing to discuss the issue in 6-9 months if she met all production goals at that time. Defendant's Exhibit 31.[16]

The plaintiff filed a formal charge with the EEOC alleging disability discrimination on May 10, 2007. She alleged that, while her request to work at home to care for disabled family members had been denied because she had not met production goals, other employees who had not met their goals had been allowed to work from home. Farmers received notice of the charge on May 14, 2007.

The plaintiff met on May 23, 2007, with Warminsky, Tevebaugh, and Claiborne, who explained that her request to work from home was being denied because she was not meeting her production goals. Claiborne did not believe, when the plaintiff was not fulfilling her production goals when working in the office, that she could meet them when working at home where she would be distracted caring for her child. The plaintiff questioned why her request was being denied when another employee, Brown, was allowed to work from home despite his failure to meet production goals. Warminsky told the plaintiff they would reconsider their decision in six to nine months "once her production numbers came back up."

---

[16]Although possibly hearsay, the plaintiff did not object to Exhibit 31 or any other Exhibit on that basis and the defendant did not challenge any of the plaintiff's exhibits on hearsay grounds.

Defendant's Exhibit 32.[17]

During the meeting Warminsky also told the plaintiff that two of her recent leave requests were being denied because she did not qualify for FMLA leave. Claiborne offered her a schedule change to help accommodate her needs.[18]

When she was absent four more days after receiving the February memo (May 24, 25, 29, and 30), the plaintiff, on May 31, 2007, was given a second Formal Warning for absenteeism. At that point she had 12 chargeable days for the year. Farmers revoked the plaintiff's flex schedule privileges as of May 31, 2007, with their reinstatement to be reevaluated no earlier than January 19, 2008. Defendant's Exhibit 14. Days the plaintiff was off for family/parental leave were not considered chargeable absences.

During the next two weeks the plaintiff had five more unexcused absences and was placed on probation for absenteeism on Thursday, June 21, 2007. At that time the plaintiff had seventeen unexcused absences for the twelve month period. She was advised that Thursday, when given the memo placing her on probation, that she would be terminated if

---

[17]*The plaintiff asserts that "[a]n adjuster can fail to meet production goals for two to three months before it becomes a concern." Plaintiff's response, p. 6. The cited evidence, Claiborne depo., p. 38, does not substantiate that statement. What Claiborne stated was that, when evaluating an employee's performance, he started with their year-to-date production, but would "go back three months to check the trends." Claiborne depo. p. 73.*

[18]*Although Farmers had a leave of absence policy that authorized an extended period of unpaid time off, the plaintiff never requested that type of leave. The plaintiff asserts that "Defendants never considered Plaintiff for extended leave without pay under this policy." Plaintiff's response, p. 8. However, the policy requires the employee to submit a written request for the leave and the plaintiff, in her April, 2007, written request to work at home stated that she was the financial provider for her family and, because FMLA leave was unpaid, wanted to work from home so she could support her family financially. Defendant's Exhibit 26.*

she had another unexcused absence. The plaintiff missed work the next two days without being excused.[19] On the following Tuesday the plaintiff sent an email to Tevebaugh, stating that she had left a voicemail the previous day and knew "per our discussion last week I could not miss any more days." Defendant's Exhibit 17. She stated that she had to be out since Friday, June 22 and would be able to return to work on Thursday, June 28. She then stated: "I was calling to see if I do have a job to come back to on Thursday?" *Id.*

Farmers terminated the plaintiff, effective June 21, 2007. The Termination Notice listed excessive absenteeism as the reason for the discharge.[20]

## Discussion

The plaintiff argues that she could have performed her job duties if allowed to work from home. She claims that if Farmers had authorized a work from home arrangement she would not have violated its absenteeism policy and been fired. The initial question is whether Farmers discriminated against the plaintiff when it refused to allow her to work from home to assist her disabled mother, but allowed another employee to work from home to care for his disabled wife. While the plaintiff might have a discrimination claim under some other

---

[19]*The plaintiff testified that she "told them I would still be gone because I had to take my mother to chemo." Defendant's Exhibit 3, p. 316.*

[20]*The termination notice was dated and signed by the plaintiff's supervisors, Blair and Claiborne, two days before the probation notice. While neither Blair nor Claiborne could explain the discrepancy, Haverfield attested that, "[a]lthough Ms. Melton had already exceeded the number of chargeable absences necessary to separate her employment under Farmers' policies and procedures, I informed Ms Melton's management team that Ms. Melton had to progress through each phase of the progressive discipline policy before Farmers would approve termination for absenteeism." Defendant's reply, Exhibit 3.*

statute, e.g. Title VII,[21] she does not have one under the ADA or Oklahoma public policy. The court also concludes that she has not shown that Farmers retaliated against her in violation of federal or state law.

ADA - Discrimination

The plaintiff asserts Farmers discriminated against her because of her relationship with a disabled family member.[22] She claims the defendant violated the ADA by refusing to allow her to work from home and by terminating her. To establish a prima facie "association discrimination" claim a plaintiff must demonstrate: (1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to adverse employment action; (3) at the time the employer knew the plaintiff had a relative with a disability; and (4) the circumstances under which the adverse employment action occurred raise a reasonable inference that the relative's disability was a determining factor in the employer's decision. " Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1085 (10th Cir. 1997).[23]

---

[21]*The plaintiff did not allege gender discrimination – that a male employee was allowed to work at home to care for a disabled relative, while she was not. Even if alleged, it is doubtful such a claim would have been successful. The defendant offered a legitimate, nondiscriminatory reason for its decision to allow Brown, but not the plaintiff, to work from home and the record lacks evidence of pretext. Brown was meeting his performance goals at work, while the plaintiff was not.*

[22]*The plaintiff asserts in her response that she is not asserting a failure to accommodate claim under the ADA.*

[23]*The McDonnell Douglas framework applies to claims of "association discrimination" brought under Section 102(b)(4) of the ADA. Den Hartog, 129 F.3d at 1085.*

The defendant did not discriminate against the plaintiff in violation of the ADA when it refused to allow the plaintiff to work from home because "[a] determination affecting [an employee's] ability to work where she chooses" is not an adverse employment action. Brockman v. Snow, 217 Fed.Appx. 201, 206 (4th Cir. 2007) (unpublished).[24]  The Tenth Circuit liberally defines the phrase "adverse employment action," not restricting the term simply "to monetary losses in the form of wages or benefits." Hillig v. Rumsfeld, 381 F.3d 1028, 1031 (10th Cir. 2004).  The appellate court has not addressed the question of whether "denial of 'work-from-home' status is an adverse employment action, but district courts in other jurisdictions have consistently held that it is not." Seldon v. Nat'l R.R. Passenger Corp., 2007 WL 3119976, at * 3 (E.D.Pa. 2007).  The court agrees with their reasoning and concludes that the defendant's refusal to let the plaintiff work from home did not rise to the level of an adverse employment action.

Regardless, the plaintiff's claim that she received disparate treatment when the defendant refused her work-at-home request fails because it is simply an attempt by the plaintiff to assert a failure to accommodate theory under a different provision of the ADA. An accommodation claim is not available because the "only two provisions requiring 'reasonable accommodation' in Title I of the ADA-suggests that only job applicants or employees, but not their relatives or associates, need be reasonably accommodated." Den

---

[24]*However, "[t]he Supreme Court has recently clarified that a different - and less strenuous - standard is used to define adverse employment actions in the retaliation context."* Brockman, *217 Fed.Appx. at 206 n.3 , citing* Burlington N. & Santa Fe Rwy. v. White, *548 U.S.53 (2006).*

Hartog, 129 F.3d at1084.  *See* 42 U.S.C. §§ 12112(b)(5)(A); 12112(b)(5)(B).

Even if the plaintiff had established the first three elements of a prima facie disparate treatment association claim, the defendant still would prevail.  The plaintiff failed to offer evidence raising the necessary inference of discriminatory motive[25] or show there is a genuine issue of material fact as to whether the defendant's explanation for denying her request – her failure to meet production goals – was pretextual or unworthy of belief.

 "A pretext argument requires the court to 'examine the facts as they appear to the person making the decision,' to determine whether the employer 'honestly believed those reasons and acted in good faith upon those beliefs.'" Berry v. T-Mobile USA, Inc., 490 F.3d 1211, 1220 (10th Cir. 2007)  (quoting Rivera v. City & County of Denver, 365 F.3d 912, 924-25 (10th Cir.2004)).  The court's "inquiry does not review the wisdom or fairness of the employer's proffered reasons," *id.*, but rather determines if "'the evidence of Plaintiff's misconduct presented to [the decisionmakers] was so weak that a rational factfinder could infer that [the] expressed reason for terminating Plaintiff must have been pretextual.'" *Id.* (quoting Rivera, 365 F.3d at 925).  "'The pertinent question in determining pretext is not whether the employer was right ... but whether that belief was genuine or pretextual.'" Zamora v. Elite Logistics, Inc., 478 F.3d 1160, at 1166 n.10 (10th Cir. 2007) (quoting Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000)).

---

[25]*As the defendant notes "[b]ecause the individual to whom the plaintiff compares herself was also associated with a disabled family member, it is illogical to conclude that the association motivated ... Farmers' decisionmaking."  Defendant's reply, p. 5.*

The plaintiff's evidence of pretext consists of the defendant's change in reasons for refusing to allow her to work from home – initially she was told that only disabled employees were eligible and later was told that she was ineligible because she failed to meet production goals – and Farmer's failure to implement the pilot program Claiborne had mentioned to her.[26] Farmer's failure to start a pilot program simply does not demonstrate discriminatory intent. Its differing explanations for its decision, under other circumstances, might.

"Because evidence that an employer gave inconsistent reasons justifying its challenged action is an 'indication of pretext,' such a showing would ordinarily be enough to survive summary judgment." Goldstein v. Sprint United Mgmt. Co., 2008 WL 2914967, at *5 (10th Cir. 2008) (unpublished) (internal citation omitted). However, the Supreme Court has recognized that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." Reeves v. Sanderson

---

[26]*The plaintiff asserts again that Brown did not meet his production goals for the months of October and November, 2006. Plaintiff's response, p. 13. However, Claiborne testified that Brown met his monthly production goals in November and December, 2006, but not October, 2006, and that he had met his year-to-date production goal at the beginning of October, 2006, for the entire year. Claiborne also explained why the data the plaintiff relied on, the information furnished by Anderson, was inaccurate – it did not account for Brown's absences due to an automobile accident. See supra note 12. The plaintiff's allegation that "Mr. Brown did not meet production goals while working from home," plaintiff's response, p. 15, is completely unsubstantiated. While the plaintiff may have believed her situation was identical to Brown's, Farmer's management did not and she has not shown their proffered reason for denying her request was pretextual or so implausible as to be unworthy of belief.*

Plumbing Products, Inc., 530 U.S. 133, 148 (2000).[27]  "[T]he nature and quantum of plaintiff's proof is key, for the Supreme Court has ... explained that evidence about the falsity of an employer's proffered [age]-neutral explanation for termination will not 'always be adequate to sustain ... liability.'" Young v. Dillon Cos., Inc., 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting Reeves, 530 U.S. at 148).

"Discussing the quantum of evidence required by Reeves, [the Tenth Circuit] has held that, '[i]n drawing [a Reeves-type] inference, the factfinder must be able to conclude, based on a preponderance of the evidence, that discrimination was a determinative factor in the employer's actions-simply disbelieving the employer is insufficient.'" Id. (quoting Miller v. Eby Realty Group LLC, 396 F.3d 1105, 1111 (10th Cir.2005)). See Reeves, 530 U.S. at 148 ( "For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."). As a rational jury could not determine, on the record before the court, that the defendant refused to accommodate the plaintiff's request to work at home because of her association with a disabled person, Farmers is entitled to summary judgment on the plaintiff's ADA discrimination/disparate treatment claim. See Swackhammer, 493 F.3d at 1168 ("This exception to the general rule against 'pretext plus' makes sense because

---

[27]Although Reeves addressed a motion for judgment as a matter of law, the standard is the same as that applicable to a summary judgment motion. Swackhammer, 493 F.3d at 1168 n.9.

16

the falsity of an employer's proffered explanation or the existence of differential treatment, defeats summary judgment only if it could reasonably lead the trier of fact to infer a discriminatory motive ...."); *cf.* Reeves, 530 U.S. at 143 (Petitioner, however, made a substantial showing that respondent's explanation was false.").

The plaintiff's claim that she was terminated in violation of the ADA fails because the plaintiff has not offered evidence demonstrating a causal relationship between her termination and her mother's disability. The plaintiff admitted that the write-ups she received for absenteeism were consistent with Farmer's attendance policy and that she was "fired for excessive absenteeism that [she] undisputedly committed." Defendant's Exhibit 3, p. 278.[28] While her absenteeism may have been due to her need to stay home to care for her mother, that does not satisfy the requirement that she was discharged because of the "known disability of an individual with whom the [plaintiff was] known to have a family ... relationship or association." 29 C.F.R. § 1630.8.

ADA - Retaliation

To establish a prima facie case of retaliation under the ADA, an employee must establish: (1) that she engaged in an activity protected by the statute; (2) was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) a causal connection between the protected activity and the adverse action. Selenke

---

[28]*The plaintiff did not dispute the defendant's factual assertion that in the 77 work weeks preceding her termination, she only worked an entire work week seven times. Defendant's motion, p. 9. She testified that the only way she could have performed her job was if she had worked from her home. Defendant's Exhibit 3, p. 49.*

v. Medical Imaging of Colo., 248 F.3d 1249, 1264 (10th Cir. 2001). A reasonable, good faith belief that the statute has been violated suffices. *Id.*

The plaintiff asserts that, while she was not fired in 2005 after she had eleven unexcused absences, she was terminated after she filed her EEOC charge.[29] Assuming she has established a prima facie case, the court finds, for the reasons discussed previously, that her evidence of pretext is insufficient.[30] The additional fact of temporal proximity between the filing of her EEOC claim and her termination does not, under the circumstances present here, change the court's analysis.

Family Medical Leave Act Claim

To establish a prima facie FMLA retaliation claim, a plaintiff must show that "1) she engaged in a protected activity; (2) [Farmers] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1287 (10th Cir. 2007) (quoting Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir.2006)). "[T]he third element of a retaliation claim is evaluated under the McDonnell Douglas burden-shifting framework." *Id.* at 1290.

While the court is unsure what evidence the plaintiff has offered that demonstrates that

---

[29]*To the extent the plaintiff claims that Farmers retaliated against her by refusing to allow her to work from home, her claim fails because the evidence is undisputed Farmers decided to deny her written request to work from home on May 11, 2007, before it learned of her EEOC charge.*

[30]*Contrary to her assertion, she has not shown that she was treated differently from a similarly situated employee.*

18

Farmers retaliated against her for taking FMLA leave, assuming she has, her claim fails for lack of evidence of retaliatory motive. The same reason that bars the plaintiff's ADA claims – the plaintiff's failure to demonstrate that the reason articulated by the defendant for refusing to approve her request to work at home and for terminating the plaintiff's employment were pretextual – bars her FMLA claims. As she has not shown that the defendant's proffered reasons for its employment decisions were so implausible, inconsistent or contradictory that a rational factfinder could conclude them to be unworthy of belief, the defendant is entitled to summary judgment on the plaintiff's FMLA retaliation claims.

Burk Tort Claim

The plaintiff's public policy or Burk tort claim fails for the same evidentiary deficiencies that preclude her federal claims

The court is not unmoved by the plaintiff's situation – a single parent trying to support her family and care for them at the same time. The defendant, though, was not unsympathetic and attempted to work with the plaintiff as she juggled her job and home responsibilities. Regardless of whether the plaintiff could have both performed her job and taken care of her family members if allowed to work at home, the defendant neither discriminated nor retaliated against her when it refused her request to work from home and when it eventually terminated her. Accordingly, the defendant's motion for summary judgment [Doc. #33] is **GRANTED**. The joint motion of the parties to strike the judicial settlement conference [Doc. #51] is **STRICKEN** as **MOOT**.

    **IT IS SO ORDERED**.

Dated this 12th day of November, 2008.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE